**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

ANTHONY LEGION,

                    Petitioner,                                        Case Number: 05-CV-40181
                                                                       Honorable Paul V. Gadola

v.


KENNETH T. MCKEE,

                    Respondent.
_____/

### OPINION AND ORDER CONDITIONALLY GRANTING
### PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS

Before the Court is Anthony Legion's ("Petitioner") petition for a writ of habeas corpus.

Petitioner, a state inmate currently incarcerated at the Bellamy Creek Correctional Facility in Ionia,

Michigan, through counsel, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254. Petitioner challenges his state convictions and sentences for first-degree murder, M.C.L.

§ 750.316, and possession of a firearm during the commission of a felony, M.C.L. § 750.227b,

stemming from the murder of Jamond McIntyre in the early morning hours of January 24, 2001.

Petitioner was sentenced to life imprisonment.

In his petition, Petitioner asserts that the Michigan Court of Appeals' decision was either

contrary to, or an unreasonable application of, clearly established federal law regarding his Sixth

Amendment right to confrontation and effective assistance of counsel claims.

For the reasons stated below, this Court **CONDITIONALLY GRANTS** Petitioner's writ of habeas corpus on his Sixth Amendment right to confrontation claim.[1]

## I. Background

The charges in this case stem from the murder of Jamond McIntyre ("Decedent" and/or "McIntyre") in the early morning hours of January 24, 2001. Petitioner and co-defendant Marvin Cotton ("Cotton") were tried jointly and convicted of first-degree murder and possession of a firearm during the commission of a felony. There was no physical evidence linking Petitioner to the murder, and there were no witnesses to the actual shooting. The evidence connecting Petitioner to the murder consisted of the uncertain eyewitness identification testimony of Kenneth Lockhart ("Lockhart"), the decedent's housemate, and Cotton's alleged confession to a jailhouse informant, Ellis Frazier ("Frazier").

## II. Procedural History

Following a joint jury trial in the Wayne County Circuit Court, the Honorable Daniel P. Ryan, presiding, Petitioner was convicted of first-degree murder, M.C.L. § 750.316, and felony firearm, M.C.L. § 750.227b. Co-defendant Cotton was also convicted of both charges.

On November 14, 2001, Judge Ryan sentenced Petitioner to life imprisonment without parole for the murder conviction and two years imprisonment for the felony firearm conviction. The case against a third defendant, Devonte Parks ("Parks"), was severed and dismissed.

Following his sentence, Petitioner filed a motion for a new trial based on insufficiency of evidence, or in the alternative, a new trial based on ineffective assistance of counsel. In that motion,

---

[1]This Court will only discuss the facts relevant to the resolution of the claim on which Petitioner is being granted habeas relief.

Petitioner requested a hearing for the purpose of creating a record of the testimony of two witnesses, Parks, and an expert in eyewitness testimony, both of whom trial counsel failed to call. The trial court denied Petitioner's motion.

Petitioner then filed a motion for reconsideration and a request for a *Ginther* hearing regarding the denial of his motion for a new trial. The trial court held oral arguments on December 6, 2002. At that hearing, an affidavit from Parks was admitted as part of the record.

In that affidavit, Parks contradicts the testimony of Frazier, the "jailhouse informant," who testified against Petitioner and co-defendant Cotton. Parks, in his affidavit, stated that he had passed a polygraph examination that dealt with the issue of whether he was at Decedent's home on the night in question. Parks was never contacted by Petitioner's attorney regarding whether he would be willing to testify on behalf of the defense. Parks said that he would have testified had he been contacted.

At the hearing, the trial court denied Petitioner's motion, finding that Parks' affidavit did not constitute new evidence that would serve as a basis for a new trial.

Thereafter, Petitioner timely filed his claim of appeal to the Michigan Court of Appeals, alleging the following:

> I.   Mr. Legions' convictions of murder in the first degree and felony firearm were constitutionally deficient and must be vacated because there was insufficient evidence to convict him of either offense.
>
> II.  Where the determinative issue in Anthony Legion's case was the credibility of the prosecution's only eyewitness, defense counsel rendered constitutionally ineffective assistance of counsel by failing to call (1) Devonte Parks and/or (2) an expert in the field of eyewitness testimony.
>
> III. The trial judge abused his discretion where he denied the

> motion for severance where it was based on the admission of a non-testifying co-defendant's alleged statement to a jailhouse informant implicating Mr. Legion and the error denied Mr. Legion his due process rights to a fair trial.

The Michigan Court of Appeals affirmed Petitioner's convictions on October 14, 2003, in an unpublished *per curiam* opinion. *People v. Cotton*, No. 239719, 2003 WL 22339219 (Mich. Ct. App. Oct. 14, 2003) (consolidated appeals of both Marvin Cotton and Anthony Legion). Petitioner then filed an application for leave to appeal with the Michigan Supreme Court, presenting the same claims. On June 10, 2004, the Michigan Supreme Court denied leave to appeal. *People v. Legion*, 470 Mich. 873, 687 N.W.2d 293 (2004). Justices Michael F. Cavanagh and Marilyn Kelly stated that they "would remand the case to the Court of Appeals for reconsideration in light of *Crawford v. Washington*, 531 U.S. 36; 124 S. Ct. 1354; 158 L. Ed. 2d 177 (2004)." *Id.*

On June 6, 2005, Petitioner filed the present petition for a writ of habeas corpus, raising the following issues:

> I.    Anthony Legion was denied his constitutional right to confrontation where the state court made a decision contrary to clearly established federal law in allowing the admission of a non-testifying co-defendant's alleged statement to a jailhouse informant implicating Mr. Legion.
>
> II.    Where the prosecution presented only questionable testimony from one eyewitness and evidence of a co-defendant's jailhouse confession, defense counsel rendered constitutionally ineffective assistance by failing to call Devonte Parks to impeach the witness.

### III. Substantive Facts

Petitioner and Cotton were tried jointly with one jury. The case against a third defendant, Parks, was severed and dismissed. The prosecution introduced no physical evidence of Petitioner's guilt, and there were no witnesses to the actual shooting. The evidence connecting Petitioner to the murder consisted of the uncertain eyewitness identification testimony of Lockhart, the Decedent's housemate, and Cotton's alleged confession to a jailhouse informant, Frazier.

At trial, Lockhart testified that on the night of January 24, 2001, he was awakened by the sound of gunshots. After the gunshots, he saw three men in the house he shared with his roommate Jamond McIntyre. Lockhart said that he later identified Petitioner, Cotton, and Parks, as the three men that he saw in the house, from a single array of photographs.

The prosecution presented many witnesses who were at or near the scene of the crime in the early morning hours of January 24, 2001. Lockhart's girlfriend, present at the house that evening, testified that she hid in a closet when she heard the shots. Kirk Washington, who was across the street when the shots were fired, said that he saw only two men shooting towards the victim's house. Danyell Ashford ("Ashford"), the Decedent's sister, and Lovely Kimble ("Kimble"), a friend of the Decedent, saw three men at the house shortly before the shooting. Santonion Adams ("Adams") was also present at the scene that evening. Adams was Decedent's cousin and an off-duty police officer. He indicated that he saw two individuals but could not identify them. All of these witnesses, along with the police officers that arrived at the scene of the shooting, provided descriptions that are at odds with Lockhart's version of the events.

Lockhart testified that on the night of the shooting, after McIntyre called to say that he had forgotten his keys, Lockhart unlocked the front door to the residence he shared with McIntyre and then returned to his own room. Later, after hearing shots outside the house, Lockhart got up and

retrieved a gun that was in the master bedroom of the house, and returned to his own room, leaving the door to his room slightly ajar.

Lockhart testified that he then observed two men in the house, one of whom was armed. He identified Petitioner as one of the two men he saw in the house, but he could not specify which man had the gun. Lockhart said that minutes later, a third individual, later identified as Cotton, entered the house. Lockhart then came out of his room and asked the men where McIntyre was, to which Cotton allegedly replied "Oh, he straight, kill him," referring to Lockhart. (Trial Tr. Vol. II, pp. 71-72, 142.). It was Lockhart's testimony that Cotton ordered the two men to "kill him," meaning Lockhart. *Id.* Lockhart said that, in response to that incitement, he fired once before his gun jammed. Lockhart then retreated to his bedroom where he remained until the police arrived on the scene.

Lockhart described the three men as bald men with goatees. However, two other witnesses provided different descriptions; one observed that the three men wore hats and skull caps that covered their heads, and the other witness saw at least one man with a black skull cap. The other witness also noted that one of the men was clean shaven.

Danyell Ashford, Decedent's sister, testified that she was at Decedent's home on the morning of the shooting to ask her brother if she could borrow some money. When she arrived, she saw three males standing on the porch. Her brother let her and the three men into the house. After getting the money from her brother, Ashford left. She testified that she did not get a good look at the three men. However, she did note that all three men wore hats and skull caps.

Lovely Kimble, Decedent's friend, was also at the house on the day of the shooting. She testified that she saw three males present; at least one had on a black skull cap, and one was clean

shaven.  At trial, Kimble identified Cotton as one of the men who was at the house, but never

identified Petitioner.  Kimble also testified that she identified a gray-green Chrysler convertible

vehicle at the scene.

The police that were called to the scene testified that they believed Lockhart's account of the

events lacked credibility.  At trial, during cross-examination, Lockhart testified, as follows, to the

questions posed to him during  the pre-trial hearing:

> Q.    Okay, Sir, I ask you again, did the police tell you that they
> didn't believe you?
>
> A.    No, that sounded like that probably be my opinion.
>
> Q.    Okay.  Sir, do you remember being asked the question, "very
> well.  What description did you give of the three individuals
> on the night you were interviewed on January 24th if you
> recall?"  Answer, "I don't recall anything.  They didn't really
> take a statement from me.  They threw me in there and said
> I'm a lie, I'm a crock of shit."  Do you remember being asked
> that question and giving that answer?
>
> A.    I recall making some statements like that, sir, yes.

* * *

(Trial Tr. Vol. II, pp. 148-153.)

Police Officer Donald Rem, an evidence technician, concluded that contrary to Lockhart's

assertion, no guns were fired inside the house.  Sergeant Carl Frederick ("Sergeant Frederick"), who

had twenty-five years of experience with homicides, believed that Lockhart had been drinking that

evening.  Sergeant Frederick interviewed Lockhart and concluded that Lockhart had changed his

story several times while he was talking to Lockhart.  Furthermore, Lockhart's version of the events

was not substantiated by the physical evidence found by the police.

Once inside the house, the police found three guns; one in the closet, one at the head of a

bed, and one under a bed. In his report, Sergeant Frederick described the house as a "dope house," and the Decedent as a "dope man." (Trial Tr. Vol. IV, p. 22.)

Lockhart attended a lineup on February 15, 2001, where photographs of Cotton, Legion, and Parks were placed in a postcard array. Immediately, Lockhart identified Cotton's photograph as one of the three men in the house.

> Q. And they asked you do you see anyone that was at the house that particular night, correct?
>
> A. They showed me the line-up and they asked me to pick out who I recognized that was in the house that evening.
>
> Q. Okay.
>
> A. I immediately picked out Mr. Cotton.

(Trial Tr. Vol. II, p. 103.)

Lockhart's testimony showed a substantial basis for his identification of Cotton: he knew him because he had seen him on multiple occasions with the decedent; he recognized him the night of the murder and later identified him by name to the police; and he unequivocally identified him both at the photo lineup and in court. Lockhart then said that photograph number two and photograph number seven, Legion and Parks respectively, "looks like the one I shot at." (Trial Tr. Vol. II, pp. 103-104.) Lockhart's identification of Legion and Parks, however, was not as certain as that of Cotton; Lockhart was only ninety percent sure of Legion's identity when presented with a photograph of him. (Trial Tr. Vol. II, pp. 106-108.). According to Lockhart's testimony, he was somewhat uncertain about the identification of Legion and Parks, because, on the night in question, the lighting in the house was not good. Futhermore, Lockhart testified that he was not sure about the exact location of both Legion and Parks in his house that night. It was Lockhart's testimony,

however, that he was one hundred percent certain of his identification of Cotton.

Santonion Adams, an off-duty Detroit police officer and Decedent's cousin, was also near the house on the night of the shooting. He testified that he went to Decedent's house that night after he got off work around 1:00 a.m. in order to borrow Decedent's van so that he could visit a female friend of his. After taking the van to visit his friend, Adams returned to Decedent's house around 2:00 a.m.

Adams testified that, as he approached the house, he was talking with Decedent on his cell phone. When Adams pulled into the driveway, he heard Decedent call his name and then heard the gunshots. Adams testified that he saw two men on the front porch firing guns, but Adams was unable to determine what direction the men were aiming. Adams said he ducked down in the van and was unable to disentangle his revolver from his sweater. Adams said, however, that he found a Glock handgun on the floor of Decedent's van. Adams indicated that he then fired several shots from the Glock through the driver-side window. He said he then left the van and fled across a vacant lot located behind Decedent's house. The police officers that arrived at the scene never found the Glock gun. However, one of the officers testified that upon inspection he noticed that four bullets were missing from the clip of Adams' service revolver.

A union representative was called to the scene because of Officer Adams' involvement in the shooting. Officer Adams made no statement to the responding officers at the scene, did not give a description of the perpetrators, and was unable to identify any defendant as one of the shooters. Like witness Kimble, Adams identified a car at the scene as a Sebring convertible.

Kirk Washington, one of Decedent's neighbors, testified that when he heard the shots, he

looked out his window and saw two men firing toward Decedent's house. He said he then saw the men throw their guns onto the roof of a nearby building and get into a gray convertible.

Andre Paul ("Paul"), Petitioner, and Cotton's friend, testified that Cotton's mother owned a green, convertible Chrysler Sebring. He also identified the same photograph of the car–a Sebring convertible– as did Adams and Kimble. Paul also testified that he had introduced Cotton to Decedent and that three weeks prior to the shooting, he and Cotton went to Decedent's home.

Aside from Lockhart's uncertain identification, the only other evidence against Petitioner was the testimony of Ellis Frazier, commonly known as "Old School," who was an inmate with Cotton after his arrest. Frazier testified that on June 28, 2001, Cotton confessed to him in the Wayne County jail when he and Cotton were both "dressing out" for court appearances. (Trial Tr. Vol. III, p. 68.) According to Frazier, the two men were in adjacent holding cells, separated by a brick wall. Each cell contained thirty to forty inmates. Frazier testified as to the nature of his conversation with Cotton:

> Q.    You can talk between cells, you can pass between cells, but
>        you actually don't have any – you're not in the same room?
>
> A.    No, no eye-to-eye contact.
>
> Q.    Okay. No eye-to-eye contact?
>
> A.    Right.
>
> Q.    It's just a voice thing?
>
> A.    Yes.

(Trial Tr. Vol III, p. 72.)

It was Frazier's testimony that, because he had previously done some time and was experienced in certain legal procedures, Cotton asked for his advice. Frazier testified that Cotton

allegedly confessed to him, stopping short of telling him who had actually shot Decedent. Furthermore, Cotton intimated to Frazier that he had a "hit" out on Lockhart. (Trial Tr. Vol. III, p. 81.) According to Frazier, Cotton told him that he and two other men went to Decedent's house on the night of the murder. Cotton allegedly told Frazier that shots were fired, and a guy who tried to run was killed. Cotton told Frazier that the police knew that he had been at the scene of the crime because witnesses observed his mother's car, a green Sebring. It was Frazier's testimony that Cotton told him that a man named "Anthony" accompanied him during the shooting. (Trial Tr. Vol. III, p. 84.) According to what Cotton told Frazier, "Anthony" was downstairs, helping Cotton get money from the safe in Decedent's house in the early morning hours of January 24, 2001.

During his confusing testimony, Frazier also repeatedly referred to "Anthony," a third participant in the holding- cell conversation between him and Cotton. (Trial Tr. Vol. III, p. 110.) Frazier testified that he thought the person sitting next to him in his cell was "Anthony," that "Anthony" discussed the crime with Cotton, and that Cotton referred to "Anthony" as being "innocent." (Trial Tr. Vol. III, p. 111.) Frazier testified in pertinent part:

> Q. Okay. Now, sir, the Anthony that you're referring to was obviously there at that particular time, correct?
>
> A. Correct.
>
> Q. Now, where was he, was he in your cell?
>
> A. He was in my cell.
>
> Q. Okay. Is that the individual or the person named Anthony that's–that was the reason why you came forward, because he was innocent?
>
> A. Yes.
>
> Q. Okay. Now, this person wasn't there that day, correct?

| | |
|---|---|
| A. | No, he wasn't. |
| Q. | Is the person that wasn't there the person that they're referring to as being innocent? |
| A. | Yes. |

*Id.*

At trial, Frazier identified a picture marked number seven from Lockhart's original photographic lineup as the person sitting next to him in the cell and whom he believed was named "Anthony." (Trial Tr. Vol. III, pp. 111-117.) Photograph number seven, however, was actually a photograph of Parks. Frazier also testified that there was no other person in the cell with Cotton during the alleged conversation. Furthermore, when asked to identify "Anthony," Frazier picked out a photograph of Devonte Parks.

Frazier's confusing testimony makes the identity of "Anthony" unclear. On one hand, he says that the individual in the cell with him is "Anthony." However, on the other hand, Frazier says that the "Anthony" that Cotton was referring to was the individual who was innocent, and that individual was not present the day he had the alleged conversation with Cotton. Frazier informed the prosecutor's office of his conversation with Cotton, and what he had heard (the conversation between Cotton and the individual allegedly named "Anthony," who was in the cell with him), in a letter written on June 29, 2001, and in a statement dated October 5, 2001.

Defense counsel moved to suppress Frazier's statement as to Petitioner, or in the alternative, to allow separate juries, arguing that the statement was an incriminating statement by a non-testifying co-defendant, which denied Petitioner his right to confront the witness. The trial court denied the motion on the basis that the statement was reliable.

**IV. Standard of Review**

Habeas petitions, filed after April 24, 1996, are governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104-132, 110 Stat. 1214 (April 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Petitioner filed his petition on June 7, 2005, and, therefore, the AEDPA applies to Petitioner's case. The AEDPA states in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceedings.

Under (d)(1), a federal court may grant a writ of habeas corpus under two different clauses, both of which provide two bases for relief. Under the "contrary to" clause, a federal court may grant habeas relief if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has decided on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). The words "contrary to" should be construed to mean "diametrically different, opposite in character or nature, or mutually opposed." *Id.*

Under the "unreasonable application" clause, a federal court may grant habeas relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts. *Williams*, 529 U.S. at 407-08. Relief is also available under this clause if the state court decision either unreasonably extends or unreasonably refuses to extend a legal principle from Supreme Court precedent to a new context. *Id.* at 407;

*Arnett v. Jackson*, 393 F.3d 681, 686 (6th Cir. 2005). The proper inquiry for the "unreasonable application" analysis is whether the state court decision was "objectively unreasonable" and not simply erroneous or incorrect. *Williams*, 529 U.S. at 407; *Lordi v. Ishee*, 384 F.3d 189, 195 (6th Cir. 2004).

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require awareness of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). Although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002).

## V.  Analysis

-14-

### A. Confrontation Clause Claim

Petitioner contends his conviction must be reversed on the ground that the trial court admitted as evidence against him the testimony of Frazier, a jailhouse informant, regarding the out-of-court statements Petitioner's non-testifying co-defendant, Cotton, made to Frazier. According to Petitioner, the admission of that testimony abridged his Sixth Amendment right to confront the witness against him. Petitioner argues that Cotton's alleged confession to Frazier did not fall within a firmly-rooted exception to the hearsay rule, and thus, under clearly established federal law, the state courts were required to exclude the confession if either, (1) cross-examination of Cotton would have had more than marginal utility for Petitioner or, (2) Cotton's alleged confession was not reliable under the totality of the circumstances. *Idaho v. Wright*, 497 U.S. 805, 818 (1990).

The Michigan Court of Appeals, the last court to issue a reasoned decision in this case, stated in pertinent part:

> On appeal, defendant Legion asserts that defendant Cotton's statement was admitted in violation of his right to confrontation. We disagree.
>
> A statement against penal interest, admissible as substantive evidence under MRE 804(b)(3), does not violate the Confrontation Clause if the prosecutor established that the declarant is unavailable as a witness and the statement bears adequate indicia of reliability or falls within a firmly rooted hearsay exception. *People v. Poole*, 444 Mich 151, 162-165; 506 NW2d 505 (1993). Applying the *Poole* factors, the trial court did not err in admitting the statement. Defendant Cotton voluntarily made the statement to Frazier, who was known as "Old School," while requesting legal advice. Defendant Cotton did not minimize his role, or shift the blame onto defendant Legion. There is no indication that the statement was made for revenge, or that defendant Cotton had a motive to lie. Therefore, the trial court correctly determined that the statement bore adequate indicia of reliability.

*Cotton*, No. 239719, 2003 WL 22339219, at *4.

-15-

The Sixth Amendment's Confrontation Clause provides, in relevant part, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. This guarantee applies to both federal and state prosecutions. *Pointer v. Texas*, 380 U.S. 400, 406 (1965). "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845 (1990). When the government seeks to offer a declarant's out-of-court statements against the accused, and, as in this case, the declarant is unavailable, courts must decide whether the Clause permits the government to deny the accused his usual right to force the declarant "to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth.' " *California v. Green*, 399 U.S. 149, 158 (1970) (footnote and citation omitted).

At the time of Petitioner's trial and direct appeal, the standard governing the admissibility of hearsay statements under the Confrontation Clause was that set forth in *Ohio v. Roberts*, 448 U.S. 56 (1980). In *Roberts*, the Court explained that the underlying purpose of the Confrontation Clause is similar to that of the hearsay rule, *i.e.*, to exclude unreliable, out-of-court statements in criminal proceedings. Thus, the Court reasoned:

> In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Roberts*, 448 U.S. at 66.

In the present case, the Wayne County Circuit Court held that the admission of Cotton's

alleged confession was constitutional, primarily because, in its view, it was against Cotton's penal interest and because the statement against penal interest of an unavailable witness is a firmly rooted exception to the hearsay rule in Michigan. MICH. R. EVID. 804(6)(3). This Court assumes, as it must, that Cotton's statements were against his penal interest as a matter of state law, but the question whether the statements fall within a firmly rooted hearsay exception for Confrontation Clause purposes is a question of federal law. Thus, this Court must decide whether the state appellate court's decision was contrary to, or an unreasonable application of, clearly established federal law, pursuant to the AEDPA.

The United States Supreme Court has allowed the admission of statements falling within a firmly rooted hearsay exception since the Court's recognition in *Mattox v. United States*, 156 U.S. 237 (1895), where it appeared clear to the Court that the Framers of the Sixth Amendment intended to respect certain unquestionable rules of evidence when they drafted the Confrontation Clause. *Id.* at 243. Justice Brown, writing for the Court, reasoned that an unduly strict and "technical" reading of the Clause would have the effect of excluding other hearsay evidence, such as dying declarations, whose admissibility neither the Framers nor anyone else two-hundred-plus years later "would have [had] the hardihood . . . to question." *Id.*

As the Supreme Court explained in *Roberts*, reliability is inferred if the evidence was admitted pursuant to a firmly rooted hearsay exception. *Roberts*, 448 U.S. at 66. The theory behind this presumption is that these firmly rooted exceptions represent judgments, based on history and practice, that statements made in certain circumstances are inherently trustworthy such that the "adversarial testing [embodied in the Confrontation Clause] would add little to [his] reliability." *Wright*, 497 U.S. at 821. Thus, a hearsay exception is "firmly rooted" if it "rest[s] upon such solid

foundations that admission of virtually any evidence within [the exception] comports with the substance of constitutional protection." *Roberts*, 448 U.S. at 66 (internal quotation omitted).

The "against penal interest" exception to the hearsay rule–unlike other previously recognized firmly rooted exceptions–is not based on the maxim that statements made without a motive to reflect on the legal consequences of one's statement, and in situations that are exceptionally conducive to veracity, lack the dangers of inaccuracy that typically accompany hearsay. The exception, rather, is founded on the broad assumption "that a person is unlikely to fabricate a statement against his own interest at the time it is made." *Chambers v. Mississippi*, 410 U.S. 284, 299 (1973).

In criminal trials, statements against penal interest are offered into evidence in three principal situations: (1) as voluntary admissions against the declarant; (2) as exculpatory evidence offered by a defendant who claims that the declarant committed, or was involved in, the offense; and (3) as evidence offered by the prosecution to establish the guilt of an alleged accomplice of the declarant. *Lilly v. Virginia*, 527 U.S. 116, 127 (1999). In *Lilly*, the Supreme Court considered the three above categories and their roots separately. The *Lilly* Court stated:

> Statements in the first category–voluntary admissions of the declarant–are routinely offered into evidence against the maker of the statement and carry a distinguished heritage confirming their admissibility when so used.
>
> * * *
>
> The second category of statements against penal interest encompasses those offered as exculpatory evidence by a defendant who claims that it was the maker of the statement, rather than he, who committed (or was involved in) the crime in question.
>
> * * *
>
> The third category includes cases . . . in which the government seeks to introduce "a confession by an accomplice which incriminates a criminal defendant."
>
> * * *

Most important, this third category of hearsay encompasses statements that are inherently unreliable. Typical of the groundswell of scholarly and judicial criticism that culminated in the *Chambers* [*v. Mississippi*, 410 U.S. at 299] decision, Wigmore's treatise still expressly distinguishes accomplices' confessions that inculpate themselves and the accused as beyond a proper understanding of the against-penal-interest exception because an accomplice often has a considerable interest in "confessing and betraying his cocriminals." Consistent with this scholarship and the assumption that underlies the analysis in our *Bruton* line of cases, we have over the years "spoken with one voice in declaring presumptively unreliable accomplices' confessions that incriminate defendants."

*Lilly*, 527 U.S. at 131 (citations omitted).

The Supreme Court in *Bruton v. United States*, 391 U.S. 123, 138 (1968) held that a co-defendant's statement, although a statement against his own penal interest, "posed such a serious threat to Bruton's right to confront and cross-examine the witnesses against him that he was entitled to a new trial." *Id.* Even Justice White in his dissent noted, "nothing in that confession which was relevant and material to Bruton's case was admissible against Bruton." *Id.*

Since the Supreme Court's ruling in *Bruton*, the Court has consistently either stated or assumed that the mere fact that one accomplice's confession qualified as a statement against his penal interest did not justify its use as evidence against another person. *See Gray v. Maryland*, 523 U.S. 185, 194-195 (1998) (Scalia, J., dissenting) (stating that co-defendant's confessions "may not be considered for the purpose of determining [the defendant's] guilt"); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) ("[W]here two defendants are tried jointly, the pretrial confession of one cannot be admitted against the other unless the confessing defendant takes the stand"). As far back as *Crawford v. United States*, 212 U.S. 183 (1909), the Court stated that, even when an alleged accomplice testifies, his confession that "incriminate[s] himself together with defendant . . . ought to be received with suspicion, and with the very greatest care and caution, and ought not to be passed

upon by the jury under the same rules governing other and credible witnesses." *Id.* at 204.

More recently, the United States Supreme Court, in *Crawford v. Washington*, 541 U.S. 36 (2004), held that the Confrontation Clause bars the admission of testimonial statements made by witnesses out-of-court, unless the declarant is unavailable and the accused has had a previous opportunity to cross-examine the witness. *See also United States v. Cromer*, 389 F.3d 662, 671 (6th Cir. 2004). This bright-line rule abrogated, in part, the prior rule of *Roberts*, that the admission of hearsay did not violate the Confrontation Clause if the declarant was unavailable and the statement fell under a "firmly rooted hearsay exception or otherwise bore particular indicia of reliability." *See Crawford,* 541 U.S. at 59.

*Crawford v. Washington*, however, dealt specifically with testimonial statements, and, thus left the *Roberts* rule untouched with respect to non-testimonial statements. The United States Supreme Court in *Crawford v. Washington* explicitly left untouched the application of *Roberts* to cases involving non-testimonial hearsay: "Where non[-]testimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law–as does *Roberts*, and as would an approach that exempted all such statements from Confrontation Clause scrutiny altogether." *Crawford*, 541 U.S. at 68. As the courts applying the *Crawford v. Washington* rule have observed,

> The lynchpin of the *Crawford* decision thus is its distinction between testimonial and non[-]testimonial hearsay; simply put, the rule announced in *Crawford* applies only to the former category of statements . . . . [U]nless a particular hearsay statement qualifies as "testimonial," *Crawford* is inapplicable and *Roberts* still controls.

*United States v. Hendricks*, 395 F.3d 173, 179 (3d Cir. 2005). Therefore, the Roberts's reliability analysis continues to apply to the admission of non-testimonial hearsay. *See*, *States v. Saget*, 377

F.3d 223, 230 (2d Cir. 2004).

In this case, it is clear that Cotton's alleged statements to Frazier were not "testimonial." *See United States v. Franklin*, 415 F.3d 537, 545-46 (6th Cir. 2005) (statements to acquaintances non-testimonial under *Crawford v. Washington*). This Court, therefore, must determine whether Frazier's hearsay statements about Cotton's involvement in the McIntyre murder fall within a firmly rooted hearsay exception or otherwise bear sufficient indicia of reliability. *Roberts*, 448 U.S. at 66.

Rule 804 of the Federal Rules of Evidence sets forth certain exceptions to the hearsay rule that apply when the declarant is an unavailable witness. Specifically, Rule 804 (b)(3) states:

> **(b) Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
>> **(3) Statement against interest.** A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Fed. R. Evid. 804(b)(3). Respondent contends that the statements were statements against Cotton's penal interest. *See* Fed. R. Evid. 804(b)(3). Respondent is correct if, at the time Cotton made the statements, they "so far tended to subject [Cotton] to civil or criminal liability . . . that a reasonable person in [Cotton's] position would not have made [the statements] unless believing [them] to be true." *Roberts*, 448 U.S. at 66.

The prosecution offered, through Frazier, Cotton's alleged confession as a statement against

Cotton's penal interest. The Sixth Circuit has held that the hearsay exception for statements against penal interest constitutes a firmly rooted exception for purposes of Confrontation Clause analysis. *Gilliam v. Mitchell*, 179 F.3d 990, 994 (6th Cir. 1999); *Neuman v. Rivers*, 125 F.3d 315, 319-320 (6th Cir. 1997). However, the United States Supreme Court in *Lilly*, held that "accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence." *Lilly,* 527 U.S. at 134. Thus, *Lilly* instructs that the statements made by Frazier regarding Cotton's statements about Legion's involvement in the McIntyre murder are presumptively unreliable, and to rebut this presumption, this Court must evaluate the "indicia of reliability" associated with Cotton's statements to Frazier, taking into account the totality of the circumstances. *Id.*

In the present case, it is clear that Cotton was unavailable to testify; at trial, he elected not to testify pursuant to his Fifth Amendment privilege against self-incrimination. It is also clear that, as stated above, Cotton's alleged confession did not fall within a firmly-rooted exception to the hearsay rule under *Lilly*. Therefore, under clearly established federal law, the state appellate courts were required to exclude the confession if either (1) cross-examination of Cotton would have had more than marginal utility for Petitioner or (2) Cotton's alleged confession was not reliably trustworthy under the totality of the circumstances. *Wright*, 497 U.S. at 818.

The Michigan Court of Appeals' decision affirmed the trial court's admission of Frazier's hearsay statements, holding that Frazier's testimony of his conversation with Cotton in the holding cell did not violate Petitioner's right to confrontation because the statement "bore adequate indicia of reliability." *People v. Cotton*, No. 238216, 2003 WL 22339219, at *4 (Mich. Ct. App. Oct. 14, 2003). In making that decision, the state appellate court cited the voluntary nature of Cotton's

statement, the candid admission of guilt, and the lack of a motivation to lie. *Id.* According to the state appellate court, Cotton's statement was against his penal interest, and, as he was unavailable as a witness, Frazier's testimony of the statement was admissible against Petitioner. *Id.*

This Court finds that conclusion contrary to clearly established federal law. Frazier's account of his conversation with Cotton implicated an "Anthony" as his accomplice in the shooting; the conversation between Frazier and Cotton is unclear as to who the "Anthony" allegedly involved in the incident actually is. (Trial Tr. Vol. III, p. 84.) And, since Cotton did not testify, Petitioner was unable to confront him about that conversation and about his alleged role in the shooting, thereby violating Petitioner's rights under the Sixth Amendment. *See Richardson*, 481 U.S. at 206 (holding that "[w]here two co-defendants are tried jointly, the pretrial confession of one cannot be admitted against the other unless the confessing defendant takes the stand."); *see also Bruton*, 391 U.S. at 137 (where even with the benefit of limiting instructions to the jury to dispel the prejudice of the hearsay statement, the instructions did not present an adequate substitute for the right to cross-examine). Furthermore, the state appellate court failed to take into account that Cotton's alleged confession was not reliable under the totality of the circumstances. *Wright*, 497 U.S. at 818.

According to *Wright*, where a non-testimonial statement is at issue, the Confrontation Clause "operates in two ways to restrict the range of admissible hearsay." *Wright*, 497 U.S. at 814. First, the prosecution "must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant." *Id.* (In this case, there is no dispute that Cotton was unavailable to testify.) Second, if a witness is shown to be unavailable, his statement is admissible "only if it bears adequate indicia of reliability." *Id.* at 814-15.

The fundamental question a court must ask in assessing reliability of a hearsay statement is was the statement "so trustworthy that cross-examination of the declarant would be of marginal utility?" *Id.* at 820. The *Wright* Court said that where cross-examination of the declarant would be of more than marginal utility, the hearsay statement is not sufficiently trustworthy that it may be admitted without violating the defendant's Sixth Amendment rights. *Id.* at 823.

### 1. The alleged Cotton confession does not satisfy the United States Supreme requirement of trustworthiness.

The parties agree that Cotton was unavailable at trial. The key question, therefore, is the reasonableness of the conclusion by the Michigan Court of Appeals that Frazier's hearsay testimony contained particularized guarantees of trustworthiness. This Court finds that the Michigan Court of Appeals failed to consider the totality of the circumstances when analyzing the alleged hearsay statements made to Frazier by Petitioner's co-defendant, Cotton.

With very little discussion, the Michigan Court of Appeals concluded that Frazier's testimony, regarding co-defendant Cotton's "jailhouse confession" which implicated Petitioner in this case, had sufficient guarantees of trustworthiness on three grounds: (1) Defendant Cotton voluntarily made the statement to Frazier while requesting legal advice, (2) Defendant Cotton did not minimize his role, or shift the blame onto defendant Legion, and (3) there is no indication that the statement was made for revenge, or that defendant Cotton had a motive to lie. *Cotton*, 2003 WL 22339219 at *4. Those three factors, taken together, led the state appellate court to conclude that the "trial court correctly determined that the statement bore adequate indicia of reliability." *Id.*

To determine whether a statement is sufficiently trustworthy for admission, this Court is not to focus on whether other evidence in the case corroborates what the statement asserts, but rather on whether there are "corroborating circumstances which clearly indicate the trustworthiness of the

statement itself." *United States v. Price*, 134 F.3d 340, 348 (6th Cir. 1998). Under *Roberts*, and its progeny, if hearsay statements do not fit within a firmly rooted hearsay exception, they are nevertheless admissible if they bear particular guarantees of trustworthiness. *Roberts*, 448 U.S. at 65. In assessing the trustworthiness of Cotton's alleged confession, Supreme Court precedent required the state appellate court to carefully consider the "totality of the circumstances" surrounding the alleged confession and to consider whether Cotton was "particularly worthy of belief." *Wright*, 497 U.S. at 818. By ignoring the factors that rendered Cotton an unreliable declarant, and, by ignoring the many factors that showed the unreliability of Cotton's alleged "jailhouse confession," the Michigan Court of Appeals failed to apply clearly established federal law.

The state appellate court failed to acknowledge the location and the surrounding circumstances of Cotton's alleged "jailhouse confession;" circumstances that surely question the reliability of Cotton's alleged confession. "[S]tatements made by co-conspirators who have never been cross-examined at any time by the defendant's own counsel have uniformly been held by the Supreme Court to be insufficiently trustworthy for admission under the confrontation clause." *Dorchy v. Jones*, 398 F.3d 783, 789 (6th Cir. 2005)

Looking at the totality of the circumstances, the state appellate court should have had serious concerns with the reliability of Cotton's "jailhouse confession." The alleged conversation between Frazier and Cotton took place in adjacent holding cells, which were separated by a brick wall, each cell holding about thirty to forty inmates. Frazier and Cotton allegedly spoke through a little gap in the wall. Neither was able to see each other at any time during their alleged conversation. Frazier claimed to make an identification based on seeing Cotton walk past the cell at a later point. In such

a public forum of criminal defendants, Cotton would have had any number of motivations for a confession which implicated Petitioner.

The state appellate court's findings therefore were at odds with clearly established federal law. *See Lilly*, 527 U.S. at 134 (holding that accomplices' confessions that inculpate a criminal defendant are not inherently reliable). If the state appellate court found Cotton's "jailhouse confession" to be reliable as a statement against penal interest, then, that finding should have only applied to its admissibility against Cotton, and not Petitioner. *Id.* at 128. The *Lilly* Court named an interest in confessing and betraying co-defendants as typical of the sort of motivations that made "presumptively unreliable" accomplices' confessions that incriminate defendants. *Id.* at 131.

Therefore, applying the principles as outlined in *Lilly* and its progenies, this Court is not convinced that Frazier's hearsay testimony, regarding Cotton's alleged confession, was sufficiently reliable as to be admissible without allowing Petitioner the opportunity to cross-examine Cotton. Testimony revealed that Cotton's alleged statements made to Frazier did spread blame to Petitioner. While Cotton allegedly admitted to doing the actual shooting, he implicated Petitioner as assisting in the robbery. Such blame-spreading statements are no more reliable than blame-shifting statements. *Lilly,* 527 U.S. at 133 (statements that "shift or spread the blame to a criminal defendant" have historically fallen outside the realm of inherently trustworthy statements); *See also United States v. Pineda*, 208 F. Supp. 2d 619 (E.D. Va. 2001) (under Supreme Court authority, there is no distinction between statements that shift blame and statements that spread blame).

Additionally, the fact that Cotton allegedly incriminated himself does not make his accusation of Petitioner any more credible. As the Supreme Court in *Lilly* explained, "[o]ne of the most effective ways to lie is to mix falsehood with truth, especially truth that seems particularly

persuasive because of its self-inculpatory nature." *Lilly,* 527 U.S. at 133 (citations omitted).  Simply stated, "accomplice testimony has always come to the courtroom blemished," and thus the fact that Cotton incriminated himself as well as Petitioner does not make his statements any more trustworthy.  *United States v. Chapin*, 231 F. Supp. 2d 600, 608 (E.D. Mich. 2002); *see also*, *Williamson v. United States*, 512 U.S. 594, 604 (1994) (a reasonable person "might think implicating someone else would decrease his practical exposure to criminal liability, at least so far as sentencing goes").

In failing to analyze the case by looking at the totality of the circumstances, the Michigan Court of Appeals' decision was an unreasonable application of Supreme Court precedent.  This Court therefore finds that Frazier's hearsay evidence regarding Cotton's admission to the McIntyre murder was improperly admitted by the trial court, because that evidence clearly implicated Petitioner, and thus, violated his right to confront the witness against him.

The Michigan Court of Appeals noted that "[e]ven if the trial court did err in admitting the statement, the error was harmless."  *Cotton*, No. 238216, 2003 WL 22339219, at *5.  Therefore, after finding that the admission of the inculpatory statements was contrary to Supreme Court precedent, the Court must next assess whether the admission of the statements was, in fact, harmless.  This Court finds that the error in admitting the statements was not harmless, and in affirming the trial court's decision, the Michigan Court of Appeals made an unreasonable determination of fact.

### 2.  Frazier's testimony was not harmless

For purposes of federal habeas corpus review, a constitutional error that implicates trial procedures shall be considered harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)(quoting

-27-

*Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *accord California v. Roy*, 519 U.S. 2, 4-5 (1996); *Gravely v. Mills*, 87 F.3d 779, 789 (6th Cir. 1996); *Clemmons v. Sowders*, 34 F.3d 352, 354 (6th Cir. 1994). Rather than place a burden on a party to prove or disprove an error's effect or influence on the verdict, the Supreme Court has clarified that it is for the judge sitting on habeas review to decide whether the error so influenced the verdict. *O'Neal v. McAninch*, 513 U.S. 432, 435-38 (1995). If the judge is sure that the error had no or very slight effect or influence, the verdict and judgment must stand. *Id.* However, if the judge has grave doubt as to whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict, the judge must treat the error as if it did and grant the habeas writ. *Id.* This standard, which was first enunciated in *Kotteakos*, 328 U.S. at 776, is grounded in the federal harmless-error rule, 28 U.S.C. § 2111, and hence, the federal courts may turn to an existing body of case law in applying it. *See Brecht*, 507 U.S. at 638.

The *Brecht* Court noted, however, that certain errors implicating fundamental constitutional process may still occur at trial and may require the reversal of a conviction without resorting to a harmless-error analysis. *Id.* The *Brecht* test remains the rule to be applied after the passage of the AEDPA. *See*, *e.g.*, *Hill v. Hofbauer*, 337 F.3d 706, 718 (6th Cir. 2003).

The state argues that, even if the Michigan Court of Appeals was unreasonable in applying the federal standard to the present case, the resulting constitutional error did not have a substantial and injurious effect on the jury's verdict and was therefore harmless.

The Michigan Court of Appeals reasoned:

> Even if the trial court did err in admitting the statement, the error was harmless. A denial of the right to confrontation is subject to harmless-error analysis. *Carines*, *supra* at 774; *People v Kelly*, 231 Mich App 627, 644; 588 NW2d 480 (1998); *People v Anderson*

> *(After Remand)*, 446 Mich 392, 404-407; 521 NW2d 538 (1994).
> Factors to be weighed in determining whether an error is harmless in
> a right to confrontation issue include "the importance of the witness'
> testimony, whether the testimony was cumulative, the presence or
> absence of evidence corroborating or contradicting the testimony of
> the witness, the extent of cross-examination otherwise permitted, and
> the overall strength of the prosecution's case." *Kelly, supra* at 644-
> 645. Defendant Cotton did not identify defendant Legion in his
> statement, nor did Frazier's testimony implicate defendant Legion in
> any way. The trial court correctly noted this fact when defendant
> Legions' attorney moved for directed verdict. We agree with the trial
> court's finding that although defendant Cotton's statement to Frazier
> did not provide any evidence against defendant Legion, Lockhart's
> testimony did. Therefore, even if the statement was erroneously
> admitted, the error was harmless.

*Cotton*, No. 238216, 2003 WL 22339219, at *5. This Court finds that the Michigan Court of

Appeals made an unreasonable determination of fact.

Here, Frazier testified that Cotton told him that an "Anthony" accompanied him during the

shooting and that "Anthony" went downstairs to assist him in emptying the safe in the decedent's

house. The testimony thus implicated an accomplice named "Anthony," the same first name of

Cotton's co-defendant at trial–Petitioner in this case, Anthony Legion. Therefore, for the jury,

Cotton's alleged confession either implicated Petitioner or someone else who just happened to have

the first name "Anthony." Even the prosecuting attorney did not feel that Cotton's alleged

confession failed to implicate Petitioner. In closing argument, the prosecutor emphasized the

significance of the "Anthony" comments:

> He tells Mr. Frazier that it was him and a person named Anthony.
> You know, it would be a cosmic coincidence for everything to come
> back to just happened to be another man in the courtroom named
> Anthony with Mr. Cotton. That Mr. Cotton and another person
> named Anthony were going to rob Mr. McIntyre on that date, that
> they went to that house on Third Street, he knew that.

(Trial Tr. Vol. IV, p. 117).

In determining that Frazier's account of Cotton's confession did not implicate or identify Petitioner, the state appellate court made a finding that was contrary to the prosecution's argument and the actual content of the alleged confession. The state appellate court essentially determined that the jury would somehow ignore the fact that Cotton's accomplice during the crime had the same name as his co-defendant, the Petitioner in this case.

The Michigan Court of Appeals' suggestion of harmless error relies on a misreading of Petitioner's implication in Cotton's alleged confession. Absent the connection between Petitioner and Cotton, the case against Petitioner unravels.

All credible physical and identification evidence points to the guilt of Cotton and two unidentifiable accomplices. Lockhart and Kimble identified Cotton at the scene. Paul and Lockhart identified Cotton as a frequent visitor to the decedent's home. Kimble and Officer Adams identified Cotton's mother's car at the scene. Lockhart does not waver in his identification of Cotton as one of the three perpetrators.

In contrast, no witnesses tied Petitioner to Cotton, the decedent, or any vehicles near the house. Kimble never identified him and Paul never saw him with Decedent. Only Lockhart and Cotton's jailhouse confession placed Petitioner at the scene. The police officers called to the scene found Lockhart's account of events incredible and contradictory to the officers' observations. The Sergeant at the scene testified that Lockhart had been drinking. Other eyewitnesses offered descriptions of the perpetrators' facial hair and head wear that were inconsistent with the description of Lockhart. Lockhart also admitted to poor lighting conditions in the house.

During the trial, the only evidence inculpating Petitioner was Cotton's jailhouse statement to Frazier. Petitioner and Cotton were co-defendants, and with the admission of Cotton's alleged

confession to Frazier, Petitioner was Cotton's accomplice to the shooting. Frazier's testimony of Cotton's alleged confession corroborates the already substantial evidence offered against Cotton, and provided the only certain link to Petitioner and the crime. Without the alleged confession, Petitioner was implicated only by unreliable and inconsistent identification testimony from a witness that even the police found incredible. Where doubts about Lockhart's testimony as to Petitioner's identification would be eliminated by Cotton's alleged confession placing him at the scene, the error is not harmless. *See United States v. Macias*, 387 F.3d 509, 518-521 (6th Cir. 2004) (finding that even with sufficient independent evidence for a finding of guilt, the significant weight added by a non-testifying co-defendant's confession implicating a defendant constituted reversible error).

Additionally, Frazier's testimony, regarding a man named "Anthony" being involved in the incident, is not clear. On one hand, Frazier believed that the individual named "Anthony" was an innocent party, and that individual was not present during the alleged conversation between him and Cotton; that is why Frazier called the police and reported the conversation with Cotton to them. On the other hand, Frazier's testimony suggests that the individual in the cell with him was named "Anthony." The link placing Petitioner at the scene of the crime is therefore tenuous indeed.

This Court finds that the admission of Frazier's hearsay testimony was not harmless error. Petitioner is entitled to habeas relief on his Confrontation Clause claim.

## VI. Conclusion

For the reasons stated above, this Court concludes that Petitioner is entitled to federal habeas relief on his claim regarding the Confrontation Clause. Because the Court has concluded that Petitioner is entitled to habeas relief on that claim, the Court considers it unnecessary to review Petitioner's other claim and declines to do so. *See Haynes v. Burke*, 115 F. Supp. 2d 813, 819-820

(E.D.Mich. 2000); *Berrier v. Egeler*, 428 F. Supp. 750, 754 (E.D.Mich. 1976).

## VII.  Order

**ACCORDINGLY, IT IS HEREBY ORDERED** that Petitioner's Application for Writ of Habeas Corpus is **CONDITIONALLY GRANTED**.  Unless the State takes action within one-hundred and twenty (120) days to schedule a new trial, Petitioner may apply for a writ ordering Respondent to release him from custody forthwith.

**SO ORDERED.**


Dated:  __July 10, 2007__                         s/Paul V. Gadola_____
                                                  HONORABLE PAUL V. GADOLA
                                                  UNITED STATES DISTRICT JUDGE

Certificate of Service

I hereby certify that on __July 10, 2007__ , I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

_____Brad H. Beaver; Valerie R. Newman_____ , and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participants: _____ .

s/Ruth A. Brissaud_____

Ruth A. Brissaud, Case Manager

(810) 341-7845